**Opinion issued July 16, 2026**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-24-00546-CR

———————————

**THE STATE OF TEXAS, Appellant**

**V.**

**DIONATE D. BANKS, Appellee**

---

**On Appeal from the 209th District Court**
**Harris County, Texas**
**Trial Court Case No. 1783269**

---

## MEMORANDUM OPINION

After a jury found appellee, Dionate D. Banks, guilty of the felony offense of murder,[1] it assessed his punishment at confinement for sixty-three years. Appellee then filed a motion for new trial, which the trial court granted, setting

---

[1] *See* TEX. PENAL CODE ANN. § 19.02.

aside the jury's guilty verdict. Appellant, the State of Texas (the "State"), challenges the trial court's order granting appellee a new trial as to guilt. In its sole issue, the State contends that the trial court erred in granting the motion for new trial.

We reverse and remand.

## Background

After the jury found appellee guilty of the felony offense of murder and assessed his punishment at confinement for sixty-three years, appellee moved for a new trial, arguing that his trial counsel failed to provide him with effective assistance of counsel during the guilt phase of trial because counsel did not "bench warrant and call Odyssey Blackmore," the person appellee was "protecting," for trial; "did not obtain the medical records for . . . Blackmore"; "did a 16-minute voir dire of the venire [panel] in th[e] murder case"; "did not meet with [appellee] to prepare for trial"; "did not hire a mitigation expert"; did not "hire[] an investigator to investigate the facts of the case"; "did not file the election [as to punishment] timely"; and "failed to interview all on-scene witnesses."[2]

---

[2] Appellee, in his motion for new trial, also asserted that his trial counsel provided ineffective assistance during the punishment phase of trial. However, the trial court granted a new trial on guilt, so we need not address appellee's claims of ineffective assistance related to the punishment phase of trial. *See* TEX. R. APP. P. 47.1.

At the hearing on appellee's motion for new trial, appellee testified that when he hired his trial counsel, Jonathan Frank, he expected that Frank "had the capability of defending [him] in the murder trial." Frank told appellee that he would hire an investigator to work on appellee's case, and appellee paid Frank cash to hire the investigator. Appellee did not know if Frank ever hired an investigator, despite appellee's payment.

According to appellee, before trial, he discussed the meaning of self-defense and defense of a third person with Frank. Frank told appellee that his actions could have been in defense of someone who could have suffered death. However, Frank did not "retain an expert to discuss the injuries that were suffered by" Blackmore, the person appellee "believed [he] w[as] defending from serious imminent bodily injury or death." Frank also did not subpoena Blackmore's medical records.[3] Thus, according to appellee, this meant that no evidence of Blackmore's "medical records," the person who, in theory, appellee believed "was suffering imminent possibility of death or serious bodily injury" was admitted into evidence. Although Frank subpoenaed Blackmore to appear at trial, she did not.[4] Appellee did not

---

[3] Appellee stated that he did not know whether Blackmore went to the hospital for her injuries.

[4] Appellee contradicted himself at times, also testifying that Frank did not subpoena Blackmore to appear at trial.

know whether Frank had ever seen Blackmore's medical records, and appellee had no information on whether Blackmore had any medical treatment.

Appellee did note that he testified during the guilt phase of trial that he believed that the complainant had a firearm and he "believed that there was a fear of imminent serious bodily injury or death." Appellee also was able to testify during the guilt phase of trial that Blackmore had sustained a broken nose due to the complainant's actions.

Appellee further testified that, at some point before trial began, he was offered "some plea bargain[]" and he rejected the State's offer based on advice from Frank. According to appellee, he was offered, in exchange for a guilty plea, a sentence of fifteen years' confinement the morning his trial began, and he rejected the State's offer in open court after "being advised" by Frank. Frank told appellee, "We can win this." Appellee stated that if he had known that the "evidence [was] clear that [he] did not have the right to use lethal force in defense of a third person" in the case, he would have accepted the State's plea bargain agreement and not proceeded to a jury trial.[5]

As to meetings with Frank before trial, appellee testified that he met with Frank at the police station for appellee's noncustodial interview two days after the

---

[5] Appellee stated that if Frank "went through all of the evidence and things that were against [him] during th[e] situation, it could've better made [him] understand why [he] should've made the choice to take the [State's] offer."

offense. Frank also attended all of appellee's court settings. Appellee noted that, while he was not in custody, he met with Frank at a restaurant and "[a]t a building."

When appellee was in custody for violating the conditions of his bond, Frank did not visit him. Frank also did not show appellee a videotaped recording of the offense while appellee was in custody.[6] When trial began, appellee was concerned because he had not seen Frank the entire time that he was in custody.

Appellee further testified that on the day that trial began, he did not feel comfortable or that they were prepared to go to trial. According to appellee, Frank had not prepared him to testify at trial, and appellee did not know "how cross-examination would occur" or what his "obligations [were] when someone asked [him] a question." When appellee told Frank he wanted a continuance, Frank said he was prepared for trial.

Appellee also explained that, during voir dire examination, Frank did not "have any notes written down," and it appeared to appellee that Frank was saying "anything that could come to his head at that moment." Frank's voir dire examination of the potential jury panel members lasted only sixteen minutes. During the State's opening statement, Frank did not take any notes, and appellee

---

[6]    However, appellee testified that Frank showed him the videotaped recording "on FaceTime when [he] was in the car once." Appellee saw the videotaped recording before trial after the State have given it to Frank. According to appellee, the videotaped recording showed Blackmore "throw[ing] the first punch."

5

did not see Frank using any notes for his opening statement.  Appellee never saw Frank with a "trial notebook."

Additionally, during the testimony of law enforcement officers at trial, Frank did not ask them any questions.  When appellee testified at trial, he did not know what questions Frank was going to ask him on direct examination, nor what the State would ask him on cross-examination.  According to appellee, if Frank had visited him while he was in custody, he would have better known how to answer questions and follow the trial court's instructions during his testimony.  Appellee did not feel prepared to testify at trial.

Appellee also testified that he had his defense witnesses reach out to Frank about testifying for the defense.  He did not know what conversations Frank had with those witnesses before trial.

Blackmore testified that appellee was a friend, and on August 14, 2022, the complainant was killed.  The complainant hit Blackmore at least once, and appellee shot the complainant "under the theory that he was defending" her.  As a result of the complainant's actions, Blackmore suffered a fracture to the center of her nose, but surgery was not required.  She had two black eyes, and she received an X-ray and a CAT scan because she "had a knot on [her] head."  She did not have any head injuries.  Blackmore did not sustain any injuries that could not heal on their own.

As to appellee's trial counsel, Blackmore explained that she spoke to Frank by telephone and sent him a written statement. He did not meet with her in person. Frank requested that Blackmore send him her medical records, but she could not send the records because she "had a pending federal charge" at the time and her attorney "did not give [her] consent to release any medical information." Blackmore told Frank that she had received medical treatment on August 14, 2022 from her primary care physician. Frank asked Blackmore "to get a form filled out to release [her] medical records," but he did not have an investigator interview her. She did not receive a bench warrant or subpoena to testify at appellee's trial on appellee's behalf. If she had received a subpoena, she would have testified on appellee's behalf at trial. Blackmore noted that she was incarcerated for the offense of "[m]isprision of a felony" from February 16, 2023 until two days before appellee's motion-for-new-trial hearing.

Frank testified that he represented appellee "in this murder case," and after being hired, he spoke with appellee several times before going with appellee to the police station so that appellee could give a statement to law enforcement officers.[7]

While meeting with law enforcement officers, appellee told them that he had acted in defense of a third person, i.e., Blackmore, because she had been attacked

---

[7] Frank noted that appellee lived in Dallas, Texas and he lived in Houston, Texas, so Frank did not meet appellee in person until the day he escorted appellee to the police station. Frank also testified that he and appellee met at a restaurant prior to going to the police station so that they could talk in person.

and the complainant had made threatening statements. Appellee also told law enforcement officers that he feared for his own life.

As to his representation of appellee, Frank testified that he took notes during his representation. He reviewed the evidence he received from the State and viewed the videotaped recording of the offense about fifteen times. He also did "voir dire preparation" and "preparation for cross [and] direct examination." He spoke to three eyewitnesses by telephone and had them prepare written statements. He also spoke with "some people" who knew the complainant, and they described their history with the complainant. One of the individuals that Frank spoke to told him that her relationship with the complainant involved "some sort of domestic violence," and another person told Frank that "[s]he had firsthand knowledge that [the complainant] was abusive."[8] Further, Frank showed appellee the videotaped recording of the offense before appellee's trial; he also discussed "[d]efense of a third person" with appellee.

Frank noted that he did not hire an investigator to work on appellee's case, and he did not subpoena anyone to appear at appellee's trial on appellee's behalf. Frank also did not subpoena Blackmore's medical records or have a medical professional testify for the defense about Blackmore's injuries. Frank obtained a photograph of Blackmore's facial injuries, and he obtained a photograph of

---

[8] Frank did not subpoena either of these witnesses to testify at trial on appellee's behalf.

8

Blackmore earlier in the evening so that he could show the difference in her appearance. Frank did not subpoena Blackmore to appear at trial,[9] but he explained that it was not his strategy to have Blackmore testify because "the entire incident was on video" and it "was going to be a matter for interpretation" as to what had happened. Further, Frank had witnesses to testify that they were with Blackmore on the night of the offense, and one of them had gone "to the hospital with . . . Blackmore and could attest to the injuries that she had." That witness had a "clean background," as did appellee. In contrast, Blackmore was "in federal custody" and did not have a "clean background," and Frank felt that her background would "mudd[y] up" the trial and "there would be a level of prejudice against her."

Additionally, Frank testified that his voir dire examination of the potential jury panel lasted about sixteen minutes. Although he did not discuss defense of a third person during voir dire, that was because it had already been discussed with the potential jurors. He did not discuss serious bodily injury or deadly force with the potential jurors. During his opening statement to the jury, he addressed defense of a third person.

As to the State's "plea offers," Frank testified that the State first offered appellee about forty years' confinement, and Frank "g[o]t them to go lower." The

---

[9]     Frank noted that he had two other witnesses testify on appellee's behalf during the guilt phase of trial.

9

State's last offer before trial was fifteen years' confinement. Frank told appellee that he should "seriously consider" the offer, and Frank "recommended that he take the deal." Frank did not advise appellee "to go to trial," and he explained to appellee that it was "a great deal." Appellee did not accept the State's offer. Frank did tell appellee that he was ready to go to trial, which Frank believed at the time.

On cross-examination, regarding his representation of appellee, Frank testified that his last visit with appellee before trial occurred the weekend before trial when appellee was in custody.[10] At that visit, he spoke with appellee about the trial process, the evidence, and the law. Frank spoke to appellee about what jury selection would be like, what appellee "could potentially expect" during trial, and "what the actual trial process would be like." To prepare appellee to testify at trial, Frank told appellee that "sometimes he g[ot] a little excited and sometimes he . . . g[o]t a little impatient as far as getting his point across but that he [should] take his time" and he should "come across as empathetic and sympathetic." Frank told appellee that he should show that he had "respect for the [complainant]," but he should emphasize the facts that leaned in his favor during his testimony.[11]

---

[10] Frank later clarified that he visited appellee on the weekend after voir dire examination had occurred, but before opening statements began. Frank spoke to appellee at length "in the holdover" each day both before and after trial. He did not visit appellee at the jail in the evenings during trial.

[11] Frank stated that he did not believe that appellee followed his advice at trial. Prior to trial, Frank told appellee not to post on social media about "how it was the family's fault that their loved one was dead," and appellee did not follow that

Frank noted that appellee had been incarcerated out of state before trial and was brought back only two or three weeks before trial began. After appellee's return, Frank met with appellee once before trial—the weekend before. However, Frank also explained that there was a year where appellee was "on bond" and not in custody, and during that time he spoke with appellee "[a]ll the time." According to Frank, he showed appellee the videotaped recording of the offense while appellee was "on bond," and he reviewed the evidence with appellee. Frank also discussed his legal theories of the case with appellee.

Frank further testified that the reason he went with appellee to make a statement to law enforcement was that he wanted appellee "to get in front of the charge," and Frank thought it would "make the self-defense claim look better."

As to his performance during the guilt phase of trial, Frank explained that he did not call Blackmore to testify on appellee's behalf because Frank wanted to emphasize that appellee was "a good guy," "had a clean background," and "had a certification with his occupation," whereas Blackmore was "a convicted felon who started both fights by punching women."[12] The witnesses that Frank called to testify on appellee's behalf, who were with appellee on the night of the offense,

---

advice either. Appellee displayed a similar mindset when he testified at trial, contrary to Frank's advice.

[12] Frank explained that prior convictions are often times used to impeach witnesses, and he was concerned about that happening if he called Blackmore to testify at trial. Frank thought that Blackmore's criminal history would be held against appellee.

had clean backgrounds. Frank believed that "their eyewitness account would be strong enough so that the jury could understand what actually happened from their perspective because [the trial] was a battle of two different sides. One side ha[d] one perspective; the other side ha[d] a different perspective." Frank also called appellee to testify at trial because to get the jury instruction on defense of a third person, either Blackmore or appellee needed to testify at trial.[13] Frank thought it was best to have appellee, instead of Blackmore, testify because he had a "very limited criminal history." It was "a tactical decision" not to have Blackmore testify at trial.

Frank further testified that at the time of trial Blackmore was incarcerated in a federal penitentiary, and he could not communicate with her at that time; he had spoken to her before her incarceration. As to her medical records, he had tried to get her medical records from her, and he had tried to get her to sign a release so that he could access her medical records, but he was never able to get access to Blackmore's medical records, despite his efforts.

As to his voir dire examination of the potential jury panel, Frank explained that he chose not to ask certain questions of the prospective jurors because the trial court and the State had sufficiently covered some topics, including defense of a third person, "the idea that the defendant [was] innocent until proven guilty," "that

---

[13] Frank noted that the trial court instructed the jury on defense of a third person based on appellee's testimony.

12

the evidence ha[d] to pull the jury to a point where they believe[d] that [the defendant was] guilty beyond a reasonable doubt but at [the beginning] he started from a level of zero[] when it c[ame] to guilt." Frank felt like most of the applicable legal principles were sufficiently covered by the time his voir dire examination began. Frank did not believe that his sixteen-minute voir dire examination harmed appellee, and his voir dire examination was "based on deliberate, key, and tactical decisions."

Frank testified that he had planned to hire an investigator for appellee's case, but appellee did not pay him enough for the investigator.[14] Frank explained that he spoke to the five witnesses at the scene who were with appellee at the time of the offense. He did not attempt to speak with the complainant's family members or friends, who were at the scene with the complainant that night. Frank noted that he spoke with two individuals who were familiar with the complainant, one of whom was his ex-girlfriend. Those individuals made allegations that the complainant had been violent with them, but Frank determined that the complainant had no criminal convictions so there was no way for Frank to "get into those prior allegations of family violence, legally, in this . . . case." Thus, it would not have been a good idea to call those individuals to testify at trial.

---

[14] Frank testified that appellee was not indigent, and he was retained counsel.

13

Frank noted that he filed an election for the jury to assess punishment, which the trial court granted, and the jury assessed punishment in appellee's case.

As to the State's "plea offers," Frank testified that the State initially offered forty years' confinement in exchange for a guilty plea by appellee. Frank engaged in discussions with the State in an attempt to get a lower offer for appellee. In the end, the State offered appellee fifteen years' confinement, which appellee turned down. Frank explained that he had no control over whether appellee accepted the State's offer and pleaded guilty. Frank thought that appellee should have accepted the State's offer, but it was appellee's decision.

**Standard of Review**

The trial court's decision to grant or deny a motion for new trial is reviewed for an abuse of discretion. *Becerra v. State*, 685 S.W.3d 120, 127 (Tex. Crim. App. 2024). "[W]e do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable." *Id.* An abuse of discretion occurs when "no reasonable view of the record could support [the trial court's] ruling." *Id.* When deciding whether a trial court erred in granting a new-trial motion, we view the evidence in the light most favorable to the court's ruling; give almost total deference to the court's findings of historical fact; and, if there are no findings, imply findings necessary to support the ruling if they are reasonable and supported by the record. *State v. Gutierrez*, 541 S.W.3d 91, 98

14

(Tex. Crim. App. 2017). The trial court is the sole judge of the credibility of the evidence proffered in support of a motion for new trial. *Becerra*, 685 S.W.3d at 127; *see also Najar v. State*, 618 S.W.3d 366, 372 (Tex. Crim. App. 2021) (holding reviewing court applies "a uniformly deferential standard of review to a trial court's finding in ruling on a motion for new trial").

A trial court generally does not abuse its discretion in granting a motion for new trial if the defendant: (1) articulated a valid legal claim in his motion for new trial, (2) produced evidence or pointed to evidence in the trial record that substantiated his legal claim, and (3) showed prejudice to his substantial rights under the standards in Texas Rule of Appellate Procedure 44.2. *State v. Herndon*, 215 S.W.3d 901, 909 (Tex. Crim. App. 2007). The trial court cannot grant a new trial based on mere sympathy, an inarticulate hunch, "or simply because [it] personally believe[d] that the defendant [was] innocent or 'received a raw deal.'" *Id.* at 907. "[T]he trial court does not have discretion to grant a new trial unless the defendant shows that he is entitled to one under the law." *Id.*

### Ineffective Assistance of Counsel

In its sole issue, the State argues that the trial court erred in granting appellee a new trial as to guilt because appellee's motion asserted that he had received ineffective assistance of counsel, but appellee failed to establish that Frank's purportedly deficient performance prejudiced him.

15

The Sixth Amendment to the United States Constitution guarantees the right to the reasonably effective assistance of counsel in criminal prosecutions. U.S. CONST. amend. VI; *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001); *see also* TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 1.05; *Hernandez v. State*, 726 S.W.2d 53, 55–57 (Tex. Crim. App. 1986) (test for ineffective assistance of counsel same under both federal and state constitutions). To prove a claim of ineffective assistance of counsel, a defendant must show that (1) his trial counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011).

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's performance fell within the wide range of reasonable professional assistance or trial strategy. *See Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006). A defendant has the burden to establish both prongs of the *Strickland* test by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). A

16

defendant's "failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *see also Strickland*, 466 U.S. at 697.

## A. Blackmore's Failure to Testify

In a portion of its sole issue, the State argues that the trial court erred in granting appellee a new trial based on ineffective assistance of counsel because, although appellee alleged that Frank erred in failing to "bench warrant and call . . . Blackmore" to testify during the guilt phase of trial, appellee did not establish that Blackmore's testimony would have helped the defense.

A defendant is not entitled to a presumption of prejudice. *See Lopez v. State*, 358 S.W.3d 691, 696 (Tex. App.—San Antonio 2011, pet. ref'd). To obtain relief on an ineffective-assistance-of-counsel complaint based on an uncalled witness, a defendant must show that the witness was available to testify and that her testimony would have been some benefit to the defense. *See Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004); *Crawford v. State*, 355 S.W.3d 193, 199 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *Pinkston v. State*, 744 S.W.2d 329, 332 (Tex. App.—Houston [1st Dist.] 1988, no pet.) ("An attorney's failure to investigate or present witnesses will be a basis for establishing ineffective assistance of counsel only where it is shown that the witnesses would have been

available and that the presentation of the evidence would have benefitted [the defendant].").

The State does not dispute that at the motion-for-new-trial hearing, Blackmore testified that she would have been available to testify at trial on appellee's behalf. However, there is nothing in the record showing that her testimony would have aided the defense during the guilt phase of trial.

Frank explained at the hearing on appellee's motion for new trial, that although Blackmore was at the scene when the offense occurred and was the "third person" who appellee was purportedly defending when he shot the complainant, Frank did not call Blackmore to testify because "the entire incident was on video" and it "was going to be a matter for interpretation" for the jury as to what had happened. Further, at the time of trial, Blackmore was "in federal custody," had a criminal history, and had started "fights by punching women," which Frank believed would have reflected poorly on appellee, who did not have a criminal history. Thus, instead, Frank had witnesses, who were also present at the scene, who had accompanied Blackmore to the hospital after the incident, and who had a "clean background," testify as to Blackmore's injuries and provide their "eyewitness account[s]" of what happened on the night of the offense. Additionally, a photograph of Blackmore's injuries was admitted into evidence during the guilt phase of trial. And appellee testified at trial, which permitted the

trial court to submit an instruction on defense of a third person to the jury for consideration. *See, e.g.*, *Sandoval v. State*, No. 13-22-00237-CR, 2023 WL 6886106, at *6 (Tex. App.—Corpus Christi–Edinburg Oct. 19, 2023, no pet.) (mem. op., not designated for publication) (defendant did not establish uncalled witness's testimony would have benefited the defense where "much of the same information was testified to by" other witnesses); *Crawford*, 355 S.W.3d at 199 (defendant did not "identify any fact to which [the uncalled witness] would testify that the trial court had not heard from another witness"); *Tutt v. State*, 940 S.W.2d 114, 121 (Tex. App.—Tyler 1996, pet. ref'd) (defendant's trial counsel was not ineffective for failing to call certain witnesses when their testimony would have been cumulative of other testimony).

We conclude that appellee did not establish a reasonable probability that, but for Frank's purported unprofessional error in failing to "bench warrant and call" Blackmore to testify during the guilt phase of the trial, the result of the proceeding would have been different.

**B.    Failure to Obtain Blackmore's Medical Records**

In another portion of its sole issue, the State argues that the trial court erred in granting appellee a new trial based on ineffective assistance of counsel because, although appellee alleged that Frank erred in "not obtain[ing] the medical records

19

for . . . Blackmore," appellee failed to establish that Frank's purported error "actually had an adverse effect on the defense." (Internal quotations omitted.)

A copy of Blackmore's medical records was not admitted into evidence at the motion-for-new-trial hearing, and there is nothing in the record as to the information Blackmore's medical records would have contained. The appellate record must affirmatively demonstrate the meritorious nature of a defendant's ineffective-assistance-of-counsel claim. *See Menefield v. State*, 363 S.W.3d 591, 592–93 (Tex. Crim. App. 2012); *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). Here, we cannot conclude that it does.

Further, Frank explained at the motion-for-new-trial hearing that he had witnesses, including appellee, testify as to the injuries Blackmore sustained on the night of the offense, and a photograph showing Blackmore's injuries was admitted into evidence. *See Thomas v. State*, No. 01-03-0116-CR, 2004 WL 2677176, at *3 (Tex. App.—Houston [1st Dist.] Nov. 24, 2004, pet. ref'd) (mem. op., not designated for publication) (defendant failed to establish that counsel's failure to obtain medical records prejudiced him where, even if "medical records might have enhanced [the] defense, [defendant] . . . [did not] establish[] that failure to obtain the records precluded him from presenting a viable defense"); *see also Hampton v. State*, No. 03-14-00111-CR, 2016 WL 806607, at *1–4 (Tex. App.—Austin Feb. 24, 2016, no pet.) (mem. op., not designated for publication) (concluding defendant

20

did not meet burden of providing that "there was a reasonable probability that the admission of the [medical] records would have changed the outcome of his trial," where defendant testified to information contained in those records).

We conclude that appellee did not establish a reasonable probability that, but for Frank's purported unprofessional error in failing to obtain Blackmore's medical records, the result of the proceeding would have been different.

## C. Voir Dire Examination

In another portion of its sole issue, the State argues that the trial court erred in granting appellee a new trial based on ineffective assistance of counsel because, although appellee alleged that Frank erred in "d[oing] a 16-minute voir dire of the venire [panel] in th[e] murder case," appellee failed to show that he was prejudiced by his "trial counsel not using every available minute of voir dire."

Appellee's complaint, in his new-trial motion, as to Frank's voir dire examination of the potential jury panel focused on the length of the examination, which presumably means that appellee believed that Frank should have asked more questions of the potential jury panel. However, the Texas Court of Criminal Appeals has held that a trial counsel's "failure to ask any questions in voir dire [does not] constitute[] conduct so outrageous that no competent attorney would have engaged in it." *Goodspeed*, 187 S.W.3d at 392–94.

21

At the hearing on appellee's motion for new trial, Frank testified that during his voir dire examination, he chose not to ask certain questions of the prospective jurors because the trial court and the State had sufficiently covered certain topics, including defense of a third person, "the idea that the defendant [was] innocent until proven guilty," and "that the evidence ha[d] to pull the jury to a point where they believe[d] that [the defendant was] guilty beyond a reasonable doubt but at [the beginning] he started from a level of zero[] when it c[ame] to guilt." In other words, Frank felt that most of the applicable legal principles had been sufficiently covered by the time it was his turn to conduct his voir dire examination of the prospective jurors. Frank did not believe that his sixteen-minute voir dire examination harmed appellee, and his voir dire examination was "based on deliberate, key, and tactical decisions." *See id.* at 392–93 (it may be appropriate trial strategy for defense counsel to avoid repeating State's line of questioning during voir dire); *De La Cruz v. State*, No. 11-15-00281-CR, 2017 WL 1275653, at *3 (Tex. App.—Eastland Mar. 31, 2017, no pet.) (mem. op., not designated for publication) ("[W]e cannot say that trial counsel's decision not to retrace several areas of questioning that the State had already covered was an unsound strategy that no reasonable professional would have employed.").

Further, we note that appellee did not identify any juror characteristics that were missed by Frank because of his purportedly "short" sixteen-minute voir dire

examination. *Cf. Armstrong v. State*, 897 S.W.2d 361, 363–64 (Tex. Crim. App. 1995) (juror had undisclosed relationship with State's attorney that should have been uncovered by counsel during voir dire examination). And Frank actively participated in the discussion with the trial court and the State about excusing potential jurors for cause, and he exercised his peremptory strikes at trial. *See, e.g.*, *Ray v. State*, No. 12-10-00365-CR, 2012 WL 690317, at *3 (Tex. App.—Tyler Feb. 29, 2012, no pet.) (mem. op., not designated for publication). Although appellee asserted that Frank failed to conduct a "vigorous voir dire," appellee did not establish that he was prejudiced by Frank's failure to ask a certain question[15] or undertake a more comprehensive examination. *See Ramirez v. State*, Nos. 13-09-00073-CR, 13-09-00135-CR, 2010 WL 3420616, at *4 (Tex. App.—Corpus Christi–Edinburg Aug. 31, 2010, pet. ref'd) (mem. op., not designated for publication) (record did not show that had trial counsel objected to time limit imposed by court on voir dire examination, this would have resulted in different outcome); *Hollis v. State*, 219 S.W.3d 446, 462 (Tex. App.—Austin 2007, no pet.) (defendant "failed to show (or even allege) that anything about his counsel's voir dire prejudiced the outcome of his case").

We conclude that appellee did not establish a reasonable probability that, but for Frank's purported unprofessional error in conducting a sixteen-minute voir dire

---

[15] Neither in his motion for new trial nor at the hearing on his motion did appellee identify what a more "vigorous" voir dire examination would have revealed.

23

examination, the result of the proceeding would have been different. *See Goodspeed*, 187 S.W.3d at 394 (holding defendant not prejudiced by trial counsel's failure to ask any questions during voir dire examination).

**D.    Failure to Meet with Appellee**

Next, in a portion of its sole issue, the State argues that the trial court erred in granting appellee a new trial based on ineffective assistance of counsel because, although appellee alleged that Frank erred in "not meet[ing] with [appellee] to prepare for trial," appellee "did not show any concrete harm from [counsel's] alleged deficiency."

The record indicates that after appellee was arrested, he spent a few days in jail before he was released "on bond." Appellee then remained out of custody for about a year before his bond was revoked. Appellee testified at the hearing on his motion for new trial that he spent about nine months in custody before his trial after he violated the conditions of his bond.

It is true that "[a]dequate consultation between [an] attorney and [his] client is an essential element of competent representation of a criminal defendant." *Summerlin v. Schriro*, 427 F.3d 623, 633 (9th Cir. 2005) (internal quotations omitted). However, a limited number of meetings between a defendant and his trial counsel before trial does not necessarily amount to inadequate consultation. *See Murray v. Maggio*, 736 F.2d 279, 282–83 (5th Cir. 1984) ("[B]revity of

24

consultation time between a defendant and his counsel, alone, cannot support a claim for ineffective assistance of counsel."). "[N]o case establish[es] a minimum number of meetings between [a defense] counsel and [his] client prior to trial [that are] necessary to prepare an attorney to provide effective assistance of counsel." *U.S. v. Olson*, 846 F.2d 1103, 1108 (7th Cir. 1988) (internal quotations omitted).

At the hearing on appellee's motion for new trial, appellee explained that he met with Frank two days after the offense, at the police station, before appellee was arrested, and Frank accompanied appellee to his noncustodial interview with law enforcement officers. He also met with Frank in the courtroom whenever appellee appeared in court. And appellee stated that when he was not in custody for violating his bond conditions, he met with Frank at a restaurant and "[a]t a building." Frank also showed appellee the videotaped recording of the offense before appellee's trial.

Frank testified at the motion-for-new-trial hearing that because appellee lived in Dallas and he lived in Houston, he did not meet appellee in person until the day he escorted appellee to the police station so that appellee could give law enforcement officers his statement. Before meeting in person though, Frank spoke to appellee on the telephone several times, and he and appellee went to a restaurant to talk in person before appellee gave his statement to law enforcement officers.

Frank also testified that while the case was pending and appellee was "on bond," he showed appellee the videotaped recording of the offense, and he discussed "[d]efense of a third person" with appellee. Frank also discussed the evidence with appellee and his legal theories of the case. During the year when appellee was "on bond" and not in custody, Frank spoke with appellee "[a]ll the time."

Frank further testified that after appellee violated the conditions of his bond and was placed in custody, appellee was incarcerated out of state before trial and brought back only two or three weeks before trial began. Frank visited appellee after he returned to Texas and before opening statements occurred in appellee's trial. At that visit, he spoke with appellee about the trial process, the evidence, and the law. Frank also discussed what appellee "could potentially expect" during trial and "what the actual trial process would be like." To prepare appellee to testify at trial, Frank told appellee that "sometimes he g[ot] a little excited and sometimes he . . . g[o]t a little impatient as far as getting his point across but that he [should] take his time" when testifying and he should "come across as empathetic and sympathetic." Frank also told appellee that he should show that he had "respect for the [complainant]," but he should emphasize the facts that leaned in his favor during his testimony.

Here, the record contains no evidence that appellee suffered any prejudice by Frank's alleged inadequacies in meeting with appellee before his trial. *See, e.g.*, *Collins v. State*, No. 06-13-00214-CR, 2014 WL 2447599, at *7 (Tex. App.—Texarkana May 30, 2014, pet. ref'd) (mem. op., not designated for publication); *Sledge v. State*, No. 12-11-00026-CR, 2012 WL 3104392, at *7–8 (Tex. App.—Tyler July 31, 2012, pet. ref'd) (mem. op., not designated for publication). We conclude that appellee failed to establish a reasonable probability that, but for Frank's purported unprofessional error in failing to meet with appellee before trial, the result of the proceeding would have been different.

## E.     Failure to Prepare Appellee to Testify

In another portion of its sole issue, the State argues that the trial court erred in granting appellee a new trial based on ineffective assistance of counsel because, although appellee alleged that Frank erred in not preparing him to testify during the guilt phase of trial, appellee had not asserted that "there was anything he wanted to testify to but was unable to for lack of preparation," and appellee had not asserted that there was "anything he would not have said on cross[-examination] if he had been properly advised."

To prevail on a claim of ineffective assistance of counsel for failing to adequately prepare a defendant to testify, the defendant must demonstrate that the alleged error caused him prejudice, i.e., that better preparation would have

benefited the defendant and led to a better result. *Shamim v. State*, 443 S.W.3d 316, 324–25 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd).

At the hearing on his motion for new trial, appellee testified that he did not believe that Frank had prepared him to testify at trial because he did not know "how cross-examination would occur" or what his "obligations [were] when someone asked [him] a question." Further, according to appellee, before testifying, he did not know what questions Frank would ask him on direct examination, and he had no idea what the State would ask him on cross-examination. In appellee's opinion, if Frank had visited him while he was in custody, he would have better known how to answer questions and follow the trial court's instructions during his testimony at trial.

The record does not show how additional trial preparation would have benefited appellee or led to a better result at trial. *See id.*; *see also Kerr v. State*, Nos. 02-20-00034-CR, 02-20-00035-CR, 2021 WL 3793817, at *5 (Tex. App.— Fort Worth Aug. 26, 2021, no pet.) (mem. op., not designated for publication) (defendant did not "show[] that additional preparation and communication between him and his counsel before trial would have changed the trial's outcome"). We conclude that appellee failed to show a reasonable probability that, but for Frank's purported unprofessional error in failing to prepare appellee to testify for the guilt phase of the trial, the result of the proceeding would have been different.

**F.     Failure to Hire Investigator[16]**

In a portion of its sole issue, the State argues that the trial court erred in granting appellee a new trial based on ineffective assistance of counsel because, although appellee alleged that Frank erred in not hiring an investigator, appellee "adduced no evidence of which investigator [Frank] should have hired, what that investigator would have uncovered, or how that would have helped" appellee.

At the new-trial hearing, appellee testified that Frank told him that he would hire an investigator to work on appellee's case and appellee paid Frank cash to hire an investigator.  Appellee did not know if Frank ever hired an investigator.

Frank testified that he did not hire an investigator to work on appellee's case because appellee did not pay him enough money for an investigator to be hired.[17] Instead, Frank conducted his own investigation into the facts of the case.

---

[16]     In his motion for new trial, appellee also complained that Frank failed to hire a "mitigation expert."  Evidence relevant to mitigation of punishment is admissible during the punishment phase at trial.  *See Eaves v. State*, 141 S.W.3d 686, 693 (Tex. App.—Texarkana 2004, pet. ref'd).  Thus, appellee's assertion in his motion for new trial that Frank provided him with ineffective assistance because Frank did not hire a "mitigation expert" would have been grounds for the trial court to grant a new trial on punishment.  *See, e.g.*, *Lampkin v. State*, 470 S.W.3d 876, 925–26 (Tex. App.—Texarkana 2015, pet. ref'd) (granting new trial on punishment only where counsel did not investigate and present mitigating evidence during punishment).  Here, however, the trial court granted a new trial on guilt, so we need not address any complaint by appellee about the lack of a "mitigation expert," which was relevant only to a potential new trial on punishment.  *See* TEX. R. APP. P. 47.1; *see also id.* 21.9(a) ("[A] court must grant only a new trial on punishment when it has found a ground that affected only the assessment of punishment.").

[17]     Frank testified that appellee was not indigent, and he was retained counsel.

29

Defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Nevertheless, a claim for ineffective assistance based on trial counsel's general failure to investigate the facts of the case fails absent a showing of what the investigation would have revealed that reasonably could have changed the result of the case. *Stokes v. State*, 298 S.W.3d 428, 432 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd). "Ineffective assistance of counsel claims are not built on retrospective speculation; they must be firmly founded in the record." *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002) (internal quotations omitted).

Even assuming Frank's failure to hire an investigator constituted deficient performance, appellee did not establish what hiring an investigator would have revealed or that the results of any additional investigation could have changed the outcome of the case. *Cf. Goss v. State*, No. 14-22-00062-CR, 2024 WL 334209, at *3 (Tex. App.—Houston [14th Dist.] Jan. 30, 2024, pet. ref'd) (mem. op., not designated for publication); *Cantu v. State*, No. 14-13-00854-CR, 2014 WL 6968599, at *7–8 (Tex. App.—Houston [14th Dist.] Dec. 9, 2014, no pet.) (mem. op., not designated for publication); *see also Brumbalow v. State*, No. 07-24-00085-CR, 2025 WL 1451829, at *4 (Tex. App.—Amarillo May 20, 2025, pet. ref'd) (mem. op., not designated for publication) ("The record does not

demonstrate how counsel's alleged failure to further investigate caused prejudice to [defendant] beyond mere conjecture and speculation."). We conclude that appellee failed to show a reasonable probability that, but for Frank's purported unprofessional error in failing to hire an investigator, the result of the proceeding would have been different.

## G. Untimely Punishment Election

In another portion of its sole issue, the State argues that the trial court erred in granting appellee a new trial based on ineffective assistance of counsel because, although appellee alleged that Frank "did not file the election [as to punishment] timely," appellee was not prejudiced because the jury assessed his punishment, as he requested.

If a finding of guilty is returned, it shall then be the responsibility of the trial court to assess the punishment applicable to the offense. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 2(b). However, if a defendant elects in writing before the commencement of the voir dire examination of the jury panel, he may have the same jury that assessed his guilt also assess his punishment. *Id.*; *Ex parte Pete*, 517 S.W.3d 825, 831 (Tex. Crim. App. 2017) ("The default under this provision is judge-assessed punishment, but a defendant may obtain jury punishment, at his option, 'where [he] so elects in writing before the commencement of the voir dire examination of the jury panel . . . .'" (first alteration in original) (quoting TEX.

CODE CRIM. PROC. ANN. art. 37.07, § 2(b))). To preserve the right to have the same jury decide both the defendant's guilt and his punishment, the defendant must comply with the statutory requirement that he make his written election before the commencement of the voir dire examination of the jury panel. *State v. Valle*, No. 01-22-00279-CR, 2023 WL 5436435, at *6 (Tex. App.—Houston [1st Dist.] Aug. 24, 2023), *rev'd on other grounds*, *State v. Valle*, No. PD-0653-23, 2024 WL 178074 (Tex. Crim. App. Jan. 17, 2024) (not designated for publication).

It is undisputed that Frank did not file appellee's election to have the jury assess his punishment until after voir dire was complete. However, it is also undisputed that the same jury that assessed appellee's guilt also assessed his punishment despite the late-filed election. We conclude that appellee failed to show a reasonable probability that, but for Frank's purported unprofessional error in failing to timely file appellee's election to have the jury assess his punishment, the result of the proceeding would have been different. *Cf. Ross v. State*, 180 S.W.3d 172, 175–77 (Tex. App.—Tyler 2005, pet. ref'd) (even where defendant's counsel failed to file election to have jury assess punishment, defendant did not show that, but for counsel's unprofessional error, result of proceeding would have been different).

## H. On-Scene Witnesses

Additionally, in a portion of its sole issue, the State argues that the trial court erred in granting appellee a new trial based on ineffective assistance of counsel because, although appellee alleged that Frank "failed to interview all on-scene witnesses," "[n]othing in . . . appellee's motion or the evidence presented at the hearing show[ed] what favorable evidence [Frank] would have found had he interviewed more people."

A defendant in a criminal case is entitled to reasonably effective assistance of counsel, including investigation of the defendant's case. *Strickland*, 466 U.S. at 690–91. Trial counsel's duty to investigate includes seeking out and interviewing potential witnesses. *Butler v. State*, 716 S.W.2d 48, 54 (Tex. Crim. App. 1986). However, as previously noted, to obtain relief on an ineffective-assistance-of-counsel complaint based on uncalled witnesses, a defendant must show that the witnesses were available to testify and that their testimony would have been some benefit to the defense. *See Ex parte White*, 160 S.W.3d at 52; *Crawford*, 355 S.W.3d at 199; *Pinkston*, 744 S.W.2d at 332 ("An attorney's failure to investigate or present witnesses will be a basis for establishing ineffective assistance of counsel only where it is shown that the witnesses would have been available and that the presentation of the evidence would have benefitted [the defendant].").

Appellee, in his motion for new trial and at the hearing, did not identify what "on-scene witnesses" Frank should have interviewed or what those witnesses would have testified about. Further, there is no evidence in the record that the unidentified "on-scene witnesses" would have been available to testify or that their testimony would have been some benefit to the defense. *See Tutt v. State*, 339 S.W.3d 166, 171 (Tex. App.—Texarkana 2011, pet. ref'd) ("We will not presume witnesses were available and would have benefitted the defense."). And nothing in the record indicates that Frank's purported deficiency in failing to interview "on-scene" witnesses prejudiced appellee.

We conclude that appellee did not establish a reasonable probability that, but for Frank's purported unprofessional error in failing to interview "all on-scene witnesses," the result of the proceeding would have been different.

## I. Other Bases

In the final portion of its sole issue, the State argues that the trial court erred in granting appellee a new trial based on ineffective assistance of counsel, to the extent that it did so relying on ineffective-assistance-of-counsel complaints that appellee raised at the new-trial hearing, but not in his original motion, because the State objected to appellee's untimely amendment.

Texas Rule of Appellate Procedure 21.4 states that a defendant must file a motion for new trial within thirty days after the trial court imposes a sentence,

specifically raising any grounds he wishes to be considered, and any amendments to the original motion raising new grounds must also be filed within that same time period. TEX R. APP. P. 21.4; *State v. Frias*, 511 S.W.3d 797, 807–08 (Tex. App.—El Paso 2016, pet. ref'd). Courts have noted that the defendant must specifically identify the bases of his claims in a motion for new trial to give the "[trial] court enough notice to prepare for the hearing and make informed rulings and to allow the State enough information to prepare a rebutting argument." *State v. Zalman*, 400 S.W.3d 590, 593–94 (Tex. Crim. App. 2013). Although the failure to file a motion for new trial within thirty days deprives the trial court of jurisdiction to hear the motion, there is no jurisdictional bar to hearing a late-filed amendment to an otherwise timely-filed motion; therefore, a trial court is only barred from considering new issues in an untimely-filed amendment if the State objects to hearing those new issues. *State v. Moore*, 225 S.W.3d 556, 557 (Tex. Crim. App. 2007). A trial court errs when it grants a motion for new trial based on matters raised for the first time in an untimely amendment when the State has objected. *See Frias*, 511 S.W.3d at 808.

In his motion for new trial, appellee argued that he was entitled to a new trial on guilt because Frank did not provide him with effective assistance of counsel. Specifically, appellee asserted that Frank was ineffective during the guilt phase of trial because he did not "bench warrant and call . . . Blackmore," the person

35

appellee was "protecting," for trial; "did not obtain the medical records for . . . Blackmore"; conducted "a 16-minute voir dire of the venire [panel] in th[e] murder case"; "did not meet with [appellee] to prepare for trial"; "did not hire a mitigation expert"; "did not hire[] an investigator to investigate the facts of the case"; "did not file the election [as to punishment] timely"; and "failed to interview all on-scene witnesses." The State asserts that, to the extent that appellee raised other ineffective-assistance-of-counsel complaints at the hearing on his motion for new trial, beyond what was raised in his motion, the trial court erred in granting appellee a new trial on such bases.

Appellee filed his motion for new trial on May 7, 2024. The trial court held a hearing on appellee's motion on June 14 and 17, 2024.[18] Also, on June 17, 2024, the State filed its objection "to the trial court granting [appellee's] motion on any basis other than that set forth in [appellee's] timely written and filed motion for new trial," including any "purported oral amendments . . . made during the hearing for new trial." *See Cueva v. State*, 339 S.W.3d 839, 859 (Tex. App.—Corpus Christi–Edinburg 2011, pet. ref'd) (State, by objecting, may "insist that the trial court rule only upon the timely motion for new trial as originally filed or timely amended, but not as untimely amended"). The trial court signed its order granting appellee a new trial as to guilt on June 25, 2024.

---

[18] The hearing on appellee's motion for new trial occurred outside the allotted thirty-day time period for amendment of appellee's motion.

Appellee argues that the State's objection was not timely filed, and the trial court was allowed to consider his oral amendments to his motion, because, at the conclusion of the motion-for-new-trial hearing, the trial court orally granted appellee's motion, and the State did not file its objection until after the hearing. However, "[t]he granting of a motion for new trial must be accomplished by written order." TEX. R. APP. P. 21.8(b). A trial court's oral pronouncement does not constitute an order granting a motion for new trial. *See State v. Guerra*, Nos. 05-25-00749-CR, 05-25-00750-CR, 2025 WL 2494741, at *1 (Tex. App.—Dallas Aug. 29, 2025, pet. ref'd) (mem. op., not designated for publication); *see also Scoggins v. State*, No. 02-19-00209-CR, 2020 WL 5241197, at *1 n.2 (Tex. App.—Fort Worth Sept. 3, 2020, pet. ref'd) (mem. op., not designated for publication) (written order on motion for new trial always required).

Here, the trial court signed its order granting appellee's motion for new trial on June 25, 2024, making the State's June 17, 2024 objection timely filed.

Thus, to the extent that the trial court granted appellee a new trial on guilt based on ineffective-assistance-of-counsel complaints that were not raised in his original written motion for new trial, we conclude that the trial court erred. *See, e.g.*, *Frias*, 511 S.W.3d at 809 (holding trial court erred to extent it granted defendant relief on new arguments raised at new-trial hearing); *Cueva*, 339 S.W.3d at 858–59.

* * *

In sum, we hold that the trial court erred in granting appellee a new trial on guilt based on appellee's claim of ineffective assistance of counsel.

We sustain the State's sole issue.

## Conclusion

We reverse the trial court's order granting a new trial and remand the cause to the trial court with instructions to reinstate the judgment of conviction and sentence.

Kristin Guiney
Justice

Panel consists of Chief Justice Adams and Justices Guerra and Guiney.

Do not publish. TEX. R. APP. P. 47.2(b).